IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

LAVANDER E. BARKLEY,
      Petitioner,

vs.                             Case No.: 4:15cv296/WS/EMT

JULIE L. JONES,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1). Respondent filed an answer and relevant portions of the state court record (ECF No. 13). Petitioner filed a reply (ECF No. 15).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b). After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of

the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.     BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 13).[1]  Petitioner was charged in the Circuit Court in and for Gadsden County, Florida, Case No. 2010-CF-472, with one count of sexual battery by a law enforcement officer (Ex. A at 7).  Following a jury trial, Petitioner was found guilty as charged (Ex. A at 34, Exs. B, C, D).  On July 22, 2011, Petitioner was sentenced to 108 months of imprisonment, with pre-sentence jail credit of 86 days (Ex. A at 44–50, Ex. E).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D11-4515 (Exs. F, G).  The First DCA affirmed the judgment per curiam without written opinion on June 15, 2012, with the mandate issuing July 3, 2012 (Ex. H).  Barkley v. State, 90 So. 3d 275 (Fla. 1st DCA 2012) (Table).  Petitioner did not seek further review.

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 13).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

On September 28, 2012, Petitioner filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. K at 1–13).  The circuit court held an evidentiary hearing (Ex. L).  The court denied the Rule 3.850 motion in an order rendered April 10, 2014 (Ex. K at 20).  Petitioner appealed the decision to the First DCA, Case No. 1D14-2964 (Ex. K at 21, Exs. M, N).  The First DCA affirmed the decision per curiam without written opinion on February 26, 2015, with the mandate issuing March 24, 2015 (Ex. O).[2]  Barkley v. State, 158 So. 3d 564 (Fla. 1st DCA 2015) (Table).

Petitioner filed the instant federal habeas action on June 4, 2015 (ECF No. 1).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death

_____

[2] Apparently, Petitioner believed that the notice of appeal was not timely received by the state circuit court; therefore, on June 3, 2014, he filed a petition for writ of habeas corpus in the First DCA, Case No. 1D14-2437, seeking a belated appeal (Ex. I).  On October 21, 2014, the First DCA dismissed the petition as moot (Ex. J).  Barkley v. State, 149 So. 3d 1154 (Fla. 1st DCA 2014) (Mem).

Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.  In

relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits in
> State court proceedings unless the adjudication of the claim–
> > (1)  resulted in a decision that was contrary to, or involved
> > an unreasonable application of, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
> > (2)  resulted in a decision that was based on an
> > unreasonable determination of the facts in light of the evidence
> > presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review

in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3]  The

appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal
> habeas court to grant a state prisoner's application for a writ of habeas
> corpus with respect to claims adjudicated on the merits in state court.
> Under § 2254(d)(1), the writ may issue only if one of the following two
> conditions is satisfied—the state court adjudication resulted in a decision
> that (1) "was contrary to . . . clearly established Federal law, as
> determined by the Supreme Court of the United States," or (2) "involved

---

[3] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

> an unreasonable application of . . . clearly established Federal law, as
> determined by the Supreme Court of the United States."  Under the
> "contrary to" clause, a federal habeas court may grant the writ if the state
> court arrives at a conclusion opposite to that reached by this court on a
> question of law or if the state court decides a case differently than this
> Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal principle from
> this Court's decisions but unreasonably applies that principle to the facts
> of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S.

156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme

Court has instructed that on any issue raised in a federal habeas petition upon which

there has been an adjudication on the merits in a formal State court proceeding, the

federal court should first ascertain the "clearly established Federal law," namely, "the

governing legal principle or principles set forth by the Supreme Court at the time the

state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S.

Ct. 1166, 155 L. Ed. 2d 144 (2003).  "Clearly established Federal law, includes only

the holdings, as opposed to the dicta, of the Supreme Court's decisions."  Woods v.

Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) (citation

omitted).

Next, the court must determine whether the State court adjudication is contrary

to the clearly established Supreme Court case law, either because "'the state court

applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim. However, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. See Woods, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'"  Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at

411) (citing Harrington v. Richter, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d

624 (2011)).  The AEDPA's "unreasonable application" standard focuses on the state

court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, *supra* at 1291

(citing Richter).  Under § 2254(d), a habeas court must determine what arguments or

theories supported or could have supported the state court's decision, and then ask

whether it is possible that fairminded jurists could disagree that those arguments or

theories are inconsistent with the holding in a prior decision of the Supreme Court.

*See* Richter, 562 U.S. at 102; *see also* Gill, *supra,* at 1292 (the federal district court

may rely on grounds other than those articulated by the state court in determining that

habeas relief was not warranted, so long as the district court did not err in concluding

that the state court's rejection of the petitioner's claims was neither an unreasonable

application of a Supreme Court holding nor an unreasonable determination of the

facts).

     Section 2254(d) also allows federal habeas relief for a claim adjudicated on the

merits in State court where that adjudication "resulted in a decision that was based on

an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified

that: "a decision adjudicated on the merits in a state court and based on a factual

determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."   28 U.S.C. § 2254(e)(1); see e.g., Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").   The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See*

Gill, 633 F.3d at 1292.  A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision.  *Id.*

Only if the federal habeas court finds that the petitioner satisfied § 2254(d) does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same).  The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

## III.    EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, *see* 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  Duncan,

513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has provided lower courts with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention in that case that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is not enough that a petitioner make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982). In Anderson, the habeas petitioner was granted relief by the Sixth Circuit Court of Appeals on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. 459 U.S. at 7 (citing Sandstrom v.

<u>Montana</u>, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law."  <u>Anderson</u>, 459 U.S. at 7.  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the <u>cited</u> case advanced a federal claim.  *Id.*, 459 U.S. at 7 and n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in <u>Duncan v. Henry</u>, 513 U.S. 364.  The <u>Duncan</u> Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[4]  The Supreme Court explained,"[i]f a habeas petitioner wishes to claim

---

[4] The petitioner in <u>Duncan</u> raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional

that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." Duncan, 513 U.S. at 365–66.  More recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004).  In Baldwin, the Supreme Court recognized that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" Id., 541 U.S. at 32.  This language, while not part of the Court's holding, provides helpful instruction.  With regard to this language, the Eleventh Circuit explained in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor
> indeed for petitioners seeking to establish exhaustion.  However, we

---

claim, the state court applied state law in resolving the appeal.  513 U.S. at 366.

agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"  McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[5]

The Eleventh Circuit, prior to Duncan, had broadly interpreted the "fair presentation" requirement.  After Duncan, however, the Eleventh Circuit has taken a more narrow approach.  For example, in Zeigler v. Crosby, the court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the United States Constitution.  345 F.3d 1300, 1307

---

[5] In his initial brief before the Court of Criminal Appeals, McNair cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law."  McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments.  Id.

(11th Cir. 2003).  The Eleventh Circuit specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words: "Appellant was denied due process and a fair trial . . . ," which could be interpreted as asserting a fair trial claim under the Due Process Clause of the Florida Constitution. *Id.* at 1308 n.5.  The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases.  The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us."  *Id.*

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review.  *See* O'Sullivan, 526 U.S. at 839–40, 848; Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *See* Coleman v. Thompson, 501 U.S. 722, 734–35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be

addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. Bailey, 172 F.3d at 1303. In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question. *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002). The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," Siebert v. Allen, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or unprecedented fashion," Judd v. Haley, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner. Ford v. Georgia, 498 U.S. 411, 424–25,

111 S. Ct. 850, 858, 112 L. Ed. 2d 935 (1991); <u>Upshaw v. Singletary</u>, 70 F.3d 576, 579 (11th Cir. 1995).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. <u>Judd v. Haley</u>, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[6]  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

To overcome a procedural default such that the federal habeas court may consider the merits of a claim, the petitioner must show cause for the default and prejudice resulting therefrom or a fundamental miscarriage of justice.  <u>Tower</u>, 7 F.3d at 210; <u>Parker</u>, 876 F.2d 1470.  "For cause to exist, an external impediment, whether

---

[6] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  <u>Marek v. Singletary</u>, 62 F.3d 1295, 1302 (11th Cir. 1995); <u>Alderman v. Zant</u>, 22 F.3d 1541, 1549 (11th Cir. 1994).

it be governmental interference or the reasonable unavailability of the factual basis for

the claim, must have prevented petitioner from raising the claim." McCleskey v. Zant,

499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray

v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).   To

satisfy   the   miscarriage   of   justice   exception,   the   petitioner   must   show   that   "a

constitutional violation has probably resulted in the conviction of one who is actually

innocent."   Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808

(1995).   "To establish the requisite probability, the petitioner must show that it is more

likely than not that no reasonable juror would have convicted him." Schlup, 513 U.S.

at 327.   Further:

> a substantial claim that constitutional error has caused the conviction of
> an innocent person is extremely rare.   To be credible, such a claim
> requires [a] petitioner to support his allegations of constitutional error
> with   new   reliable   evidence—whether   it   be   exculpatory   scientific
> evidence,   trustworthy   eyewitness   accounts,   or   critical   physical
> evidence—that was not presented at trial.

Id.  Although a habeas petitioner asserting a convincing claim of actual innocence

need not prove diligence to overcome a procedural bar, timing is a factor relevant in

evaluating the reliability of a petitioner's proof of innocence.   See McQuiggin v.

Perkins, — U.S. —, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013).   As the Court

stated in Schlup, "[a] court may consider how the timing of the submission and the

likely credibility of [a petitioner's] affiants bear on the probable reliability of . . .

evidence [of actual innocence]."  513 U.S. at 332; *see also* House, 547 U.S. at 537.

Within this framework, the court will review Petitioner's claims.

IV.    PETITIONER'S CLAIMS

A.    Ground One:  "Whether Petitioner was denied effective assistance of counsel when counsel failed to investigate and call exculpatory witness [Danny Young and Keambrial Dixon] to testify."

Petitioner concedes in his reply that the state courts properly adjudicated this

claim (ECF No. 15 at 1).

B.    Ground Two:  "Whether Petitioner was denied effective assistance of counsel when counsel failed to investigate Officer Pearson."

Petitioner alleges that on April 25, 2011, he and defense counsel, Attorney Ian

Nesbeth, went to the Gretna Police Department, where Police Chief Brian Bess

advised Nesbeth that rumors were circulating around the Gadsden County Sheriff's

Office ("GCSO") that Officer Pearson, an officer with the Quincy Police Department,

may have been personally involved with the victim, Ms. Mason (ECF No. 1 at 6–8).[7]

Petitioner alleges there was also "talk" that Ms. Mason had called Officer Pearson on

the night of the sexual battery to tell him what occurred.  Petitioner alleges he and

---

[7] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

Attorney Nesbeth went to the Quincy Police Department.  He alleges Nesbeth went

inside the Police Department while he (Petitioner) remained in the vehicle.  Petitioner

alleges Nesbeth returned a short time later and stated that he found nothing useful to

the defense.  Petitioner alleges Attorney Nesbeth conducted no further investigation

of Officer Pearson's alleged involvement with Ms. Mason.  Petitioner alleges if

Attorney Nesbeth had further investigated this issue, he would have discovered that

Officer Pearson authored a report on September 4, 2010 (the same date of the sexual

battery (*see* Ex. A at 1–3)), Quincy Police Department Case # 10004771, which

referenced that Officer Pearson had received phone calls from Ms. Mason that night.

Petitioner alleges the report references the fact that Officer Pearson knew Ms. Mason,

and that she called him at 10:07 p.m. and 10:08 p.m.  Petitioner alleges that Officer

Pearson's report also states that he called Ms. Mason at 10:23 p.m., at which time Ms.

Mason told him what happened between her and Petitioner.

      Petitioner argues that Officer Pearson's report could have been used to impeach

Ms. Mason's testimony that she did not call anyone except her mother on the night of

the sexual battery, and that she did not want to call law enforcement because she was

afraid of, and did not trust, the police (ECF No. 1 at 7).  Petitioner also contends the

report would have bolstered the defense theory that Ms. Mason was "trying to make

a quick buck" by filing a civil lawsuit concerning the sexual battery.  Petitioner asserts

Attorney Nesbeth could have used the report to suggest that Ms. Mason and Officer

Pearson were working together to secure a favorable civil judgment against Petitioner,

because Pearson would have known "what Ms. Mason needed to do and say to ensure

that they secure [sic] their favorable civil judgment."  Petitioner contends there is a

reasonable probability that the outcome of his trial would have been different if

Attorney Nesbeth had thoroughly investigated Officer Pearson's involvement with

Ms. Mason (*id.* at 8).

Respondent appears to concedes that Petitioner exhausted this claim in the state

courts (ECF No. 13 at 4–5).  Respondent adopts the state circuit court's ruling and the

argument in the State's answer brief on appeal of that ruling (*id.* at 5).  Respondent

contends the state courts did not unreasonably determine the facts, and did not

unreasonably apply clearly established federal law (*id.*).

       1.     Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set

forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  To obtain relief under

<u>Strickland</u>, Petitioner must show (1) deficient performance by counsel and (2) a

reasonable probability that, but for counsel's deficient performance, the result of the

proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms."  Strickland, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.

As to the prejudice prong, he Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"  *Id.* (quoting Strickland, 466 U.S. at 693).  However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. Strickland, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  Indeed, it would be "contrary to" the law clearly established in Strickland

for a state court to reject an ineffectiveness claim for failing to prove prejudice by a

preponderance of the evidence.  Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the

particular decisionmaker," as the court should presume that the judge or jury acted

according to law.  Strickland, 466 U.S. at 694–95.  "When a defendant challenges a

conviction, the question is whether there is a reasonable probability that, absent the

errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.

### 2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground Two in his Rule 3.850 motion (Ex. K at

4–6).  The state circuit made the following rulings at the conclusion of the post-

conviction evidentiary hearing:

> THE COURT:  All right.  Mr. Barkley, I'll be perfectly candid
> with you.  You've got to put all of these allegations in the context of this
> case.  The accused, Mr. Barkley, testified at trial.  This isn't a case of
> who done it.  This isn't a case of—I mean, this is a case where not only
> was there DNA evidence on a condom but you testified and admitted the
> basic facts of the offense.
>
> Whether another officer might have committed some sort of
> misconduct, whether Ms. Mason might have been impeached in various
> ways, all of the facts—my memory of the trial is that all of the facts were
> substantial facts about her financial interests, a lawsuit pending.  The fact

that she was represented by counsel who showed up for jury selection is my memory of it, if my memory is correct.

All of that was thoroughly explored and thoroughly placed before the jury.  The problem is that none of it matters.  The overwhelming evidence in the case is that there was a traffic stop and the sexual conduct occurred immediately following the traffic stop.  And that being the case—first of all, Mr. Nesbeth doesn't have a crystal ball.

The standard of effective assistance of counsel is not, you know, does Mr. Nesbeth predict to a moral certainty events that happen in the future.  He has to recognize them and make a judgment about them which is what he plainly did.  He was very well aware of the existence of these witnesses and made a, what in my view is a judgment that any competent defense attorney would make, which is to not, under any circumstance, alert the prosecution to the existence of witnesses who could give testimony that strengthened the prosecution's case of absence of consent.

And that's the legal standard.  Did he have a basis to make the decisions and did he recognize the issues in front of him.  And he obviously testified that he did, and there's no basis to conclude otherwise.  And in fact, you testified yourself today that he recognized the issues of the existence of the witnesses and the two of you went and had a discussion about it.

And he in fact investigated, sent the investigator to investigate the other witness, Ms. Dixon.  And Ms. Dixon's testimony does nothing except implicate Officer Pearson.  And there has to be some basis for it, to think that it would do some good in your case and there just isn't a reasonable basis to see it that way.

(Ex. L at 24–25).  Following the evidentiary hearing, the circuit court issued a written

order denying the Rule 3.850 motion (Ex. K at 20).  In the order, the court concluded

that, for the reasons stated on the record at the evidentiary hearing, Petitioner failed to demonstrate "either ineffective assistance or prejudice" with regard to the claims of ineffective assistance of counsel (Ex. K at 20).  Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. O).

In several cases, the Eleventh Circuit has applied the <u>Strickland</u> standard to claims of ineffective assistance of trial counsel ("IATC") based upon counsel's failure to pursue a certain defense.  "Th[e] correct approach toward investigation reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." <u>Rogers v. Zant</u>, 13 F.3d 384, 387 (11th Cir. 1994).  To be effective, a lawyer is not required to "pursue every path until it bears fruit or until all hope withers." <u>Williams v. Head</u>, 185 F.3d 1223, 1237 (11th Cir. 1999) (citation omitted).

Where, as here, a state court makes a factual finding that counsel strategically decided not to pursue a certain defense, that finding is entitled to a presumption of correctness under § 2254(e)(1).  *See* <u>Fotopoulos v. Sec'y Dep't of Corr.</u>, 516 F.3d 1229, 1233 (11th Cir. 2008).

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the

limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690–91.  Thus, "trial counsel has not performed deficiently when a reasonable lawyer could have decided, under the circumstances, not to investigate or present particular evidence."  Grayson v. Thompson, 257 F.3d 1194, 1225 (11th Cir. 2001); *see also* Wiggins v. Smith, 539 U.S. 410, 523, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) ("[O]ur principal concern . . . is not whether counsel should have presented a mitigation case.  Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the petitioner's] background was itself reasonable.") (emphasis omitted).  "The question is whether . . . ending an investigation short of exhaustion, was a reasonable tactical decision.  If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end."  Mills v. Singletary, 63 F.3d 999, 1024 (11th Cir. 1995) (citation omitted).  If the federal court concludes that declining to investigate further was a reasonable act, it need not look to see what a further investigation would have produced.  *See* Rogers, 13 F.3d at 388.

Further, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers, 13 F.3d at 386.  Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").  "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler v. United States, 218 F.3d 1305, 1317 (11th Cir. 2000)).  Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" Id. (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

Reasonableness is assessed objectively, measured "under prevailing professional norms," Strickland, 466 U.S. at 688, and includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time." Id. at 689; see also Hannon v. Sec'y, Dep't of Corr., 562 F.3d 1146, 1151

(11th Cir. 2009) ("The standard we apply in assessing the first prong is that of a reasonable attorney, not a paragon of the bar."); Williams, 185 F.3d at1236 ("'[I]n retrospect, one may always identify shortcomings,' but perfection is not the standard of effective assistance."); Atkins v. Singletary, 965 F.2d 952, 958, 960 (11th Cir. 1992) ("Most important, we must avoid second-guessing counsel's performance. . . . Nothing is so easy as to be wise after the event. . . .  A lawyer can almost always do something more in every case.  But the Constitution requires a good deal less than maximum performance.").  As the Eleventh Circuit said:

> In reviewing counsel's performance, a court must avoid using the distorting effects of hindsight and must evaluate the reasonableness of counsel's performance from counsel's perspective at the time. . . .  The widespread use of the tactic of attacking trial counsel by showing what "might have been" proves that nothing is clearer than hindsight—except perhaps the rule that we will not judge trial counsel's performance through hindsight.

Chandler, 218 F.3d at 1316–17 (quotations and citation omitted).  In other words, federal habeas courts recognize that "the trial lawyers, in every case, could have done something more or something different.  So, omissions are inevitable.  But, the issue is not what is possible or what is prudent or appropriate, but only what is constitutionally compelled." Id. at 1313 (quotations omitted).

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting Strickland's high bar is never an easy task."  Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010).   "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult."  Richter, 131 S. Ct. at 788. As the Richter Court explained:

> The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).   When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Id. (citations omitted).

The state court's findings of fact with regard to the testimony adduced at the evidentiary hearing is supported by the state court record.  At the evidentiary hearing, Petitioner testified that Officer Pearson was a seasoned officer with the Quincy Police

Department (Ex. L at 7).  Petitioner testified that even though Officer Pearson was the

first person who the victim told about the incident, Pearson did not file an incident

report about the sexual battery, nor was Pearson's name mentioned in the incident

report prepared by the GCSO (*id.* at 7–8).  Petitioner testified that Attorney Nesbeth

could have presented this evidence to the jury and argued that Officer Pearson could

have influenced the victim's allegations, because he "knew what to say, how to say

it" (*id.* at 8).

Ian Nesbeth testified that he had been practicing law, with a primary focus on

criminal defense, for ten years and had conducted approximately ninety jury trials (Ex.

L at 12).  Nesbeth testified that the trial strategy that he pursued was that the victim

was lying (*id.* at 13).  Attorney Nesbeth testified as follows with respect to Ground

Two:

> Q.     And as to Ground 2, there's an allegation involving you
> went in and talked to Officer Pearson and came out and reported to Mr.
> Barkley that you didn't find anything useful.  Is that correct, that you
> went in to see Officer Pearson?
>
> A.     Yes, sir.  And I could just give some background.  Mr.
> Barkley and I, we were preparing for trial and we learned about Officer
> Pearson.  I did not know about Officer Pearson beforehand.  I went into
> the Quincy Police Department and spoke with Officer Pearson.  Officer
> Pearson related to me that Ms. Mason in fact called him right after the
> event saying I got raped.  We had some more conversations about why
> he didn't report.  He indicated to me he was married, he was carrying on

an affair with Ms. Mason, and he didn't really want that to get out.  But he would come to trial and testify as to what happened.

Again, I got out of the—I left the Quincy Police Department, I talked to Mr. Barkley about it.  I told Mr. Barkley we absolutely do not want Officer Pearson involved in this case.  We really hope he doesn't go and walk down the street to see Mr. Combs [the prosecutor] because it will hurt your case.  He is going to bolster Ms. Mason's testimony.

Q.    And that would be once again, Ms. Mason making a statement to another party about being raped by Mr. Barkley?

A.    Yes, sir.  And I also talked to Mr. Barkley about the rape shield laws and things of that nature, that we may not be able to elicit testimony from him about their sexual relationship.  And it would do his case more harm than good to make him available to you, essentially.

Q.    And you were familiar with the fact that if there was an attempt to go into Ms. Mason's sexual history that that would have, by case law and statute, been found to be inadmissible.

A.    Yes, sir.

Q.    Okay.

A.    So there was no net gain.

(Ex. L at 14–16).

The state court reasonably concluded that Attorney Nesbeth's decision not to further investigate, or present evidence of, Officer Pearson's involvement in the case was reasonable.  Florida's Rape Shield statute, Florida Statutes § 794.022, prohibits introduction into evidence of specific instances of prior consensual sexual activity

between the victim and any person other than the offender except in two instances: (1) if the evidence may prove that the defendant was not the source of the semen or injury; or (2) if the evidence tends to establish a pattern of conduct on the part of the victim that is so similar to the conduct in this case that it is relevant to consent. Florida courts recognize a third, constitutional, exception where, under the unique facts of a given case, what is usually irrelevant (i.e., prior sexual conduct of the victim) becomes relevant to establish the defendant's defense. This usually involves a defendant's claim that the other sexual relationship shows a motive on the part of the victim to fabricate the charge or to establish bias.  *See* <u>Lewis v. State</u>, 591 So.2d 922 (Fla. 1991); <u>Jones v. State</u>, 577 So. 2d 606 (Fla. 4th DCA 1991); <u>Dixon v. State</u>, 605 So. 2d 960, 961 (Fla. 2d DCA 1992); <u>Kaplan v. State</u>, 451 So. 2d 1386, 1387 (Fla. 4th DCA 1984).

The theory of defense presented by Attorney Nesbeth at trial was that the sexual contact between Petitioner and Ms. Mason was consensual (that Ms. Mason willingly had sex with Petitioner in exchange for leniency, i.e., so that Petitioner would not arrest her for driving with a suspended license and/or impound her mother's car), and that Ms. Mason was motivated to lie about the encounter by the prospect of receiving financial gain by suing the City of Gretna in a civil lawsuit (*see* Ex. B at 32–38).  This

was a reasonable strategy in light of the fact that there was no dispute that Petitioner stopped Ms. Mason's vehicle, and the two of them then proceeded to the Gretna Police Department and had sexual intercourse.  Indeed, Petitioner voluntarily admitted to investigators that he had sexual intercourse with Ms. Mason, and that he used a condom that he later re-wrapped and discarded at the intersection of Church Street and Solomon Dairy Road  (*see* Ex. A at 1–3, Ex. C at 186–87).  Petitioner led Lieutenant Larry Smith of the GCSO to the condom on Church Street, and it was submitted to the Florida Department of Law Enforcement ("FDLE") for biological analysis (*see* Ex. C at 181–85, 199, 206–07, 271–72, 282).  The FDLE developed a DNA profile of sperm cells found on the inside and outside of the condom, and the DNA profile matched Petitioner's DNA at a statistical frequency of one in 33 quadrillion Caucasians, one in 4.8 quadrillion African Americans, and one in 14 quadrillion southeastern Hispanics (*see* Ex. C at 310–12).

The jury heard evidence that Ms. Mason knew that she driving with a suspended license when she was stopped by Petitioner; that she did not have money to pay her traffic tickets and was waiting until she received her income tax refund to reinstate her license; and that her mother would be very upset with her if the car was impounded (*see* Ex. B at 52–55, 87, 92–95).  The jury also heard evidence that Ms.

Mason lived in "the projects," and that the day after the incident, and after Petitioner was arrested, Ms. Mason's family retained a civil rights attorney at the law firm of Parks and Crump to represent her (*see id.* at  87, 115–18, 150, 160–61, 166–67). Indeed, Attorney Nesbeth pointed out to the jury that representatives of Parks and Crump were present at Petitioner's trial (*see id.* at 38, 115–18).

Evidence that (1) Ms. Mason first reported the sexual battery to Officer Pearson, (2) Officer Pearson did not file an incident report concerning the sexual battery,[8] and (3) the incident report(s) prepared by the GCSO did not mention Ms. Mason's contact with Officer Pearson, would not have been relevant to the defense's theory that Ms. Mason's was lying about the consensual nature of the sexual contact. Additionally, while Petitioner argues that Attorney Nesbeth could have used Officer Pearson's testimony or his alleged report to impeach Ms. Mason's testimony that she did not call anyone except her mother on the night of the incident, and that she did not want to call law enforcement because she was afraid and distrustful of the police, the trial court would have properly limited such an attempt at cross-examination for two reasons.

---

[8] The court notes that the sexual battery did not occur in the jurisdiction of the Quincy Police Department, where Officer Pearson was employed.

First, Ms. Mason did not testify that her mother was the <u>only</u> person she called. Mason testified that her mother was the <u>first</u> person she told, and that she did so approximately 10–15 minutes after the incident (Ex. B at 70, 82).

Second, although evidence that Ms. Mason called Officer Pearson would have contradicted her testimony that she did not make any phone calls to law enforcement that night (*see* Ex. B at 82–83), this was a collateral issue because it was not a material fact at Petitioner's trial.  Florida law provides that a witness's credibility may be attacked by "[p]roof by other witnesses that <u>material</u> <u>facts</u> are not as testified to by the witness being impeached." Fla. Stat. § 90.608(5) (emphasis added).  "An issue is collateral for purposes of impeachment by contradiction, if it cannot be introduced for any reason other than contradiction." <u>Griffin v. State</u>, 827 So. 2d 1098, 1099 (Fla. 1st DCA 2002) (citation omitted).  "Two types of evidence pass this test:  (1) facts relevant to a particular issue; and (2) facts which discredit a witness by pointing out the witness'[s] bias, corruption, or lack of competency.'" <u>Foster v. State</u>, 869 So. 2d 743, 745 (Fla. 2d DCA 2004) (internal quotation marks and citation omitted).

Here, the issue of whether Ms. Mason contacted Officer Pearson on the night of the sexual battery was a collateral issue, because it could be introduced for no other reason than contradiction.  Therefore, Attorney Nesbeth would not have been

permitted to use evidence of Ms. Mason's contact with Officer Pearson as impeachment.  *See, e.g.,*  Anderson v. State, 133 So. 3d 646, (Fla. 1st DCA 2014) (proposed impeachment of victim as to type of clothing she was wearing at time of sexual battery was impermissible impeachment on a collateral issue; evidence was not relevant to any issue in the case as it did not reflect on defendant's guilt or innocence, and victim's alleged false characterization of her clothing did not show bias, corruption, or lack of competency as a witness).

Finally, although Petitioner argues in his reply that Officer Pearson "would have possibly testified" that Ms. Mason was known to have sexual affairs with married law enforcement officers in Gadsden County (*see* ECF No. 15 at 2), Petitioner did not allege or present any reliable evidence of a pattern of conduct on the part of Ms. Mason that was so similar to the conduct in Petitioner's case that it was relevant to consent.  Therefore, any such testimony by Officer Pearson would not have been admissible under Florida's rape shield law.

The state court reasonably concluded that Attorney Nesbeth's failure to present evidence of Ms. Mason's contact with Officer Pearson was not deficient, nor was it prejudicial in the Strickland sense.  Therefore, Petitioner failed to demonstrate he is entitled to federal habeas relief on Ground Two.

C.     Ground Three:  "Whether Petitioner was denied effective assistance of counsel when counsel failed to obtain DNA testing of saliva sample retrieved from the victim's neck."

Petitioner concedes in his reply that the state courts properly adjudicated this claim (ECF No. 15 at 2).

D.     Ground Four: "Whether Barkley is entitled to a new trial based on newly discovered evidence."

Petitioner alleges that in February of 2012 (several months after his trial), a woman, "Ms. Hopkins," approached Petitioner's mother in a Wal-Mart and told her that at approximately 8:00 on the night of the offense (approximately one hour prior to Petitioner's conducting a traffic stop of Ms. Mason's vehicle), she saw Officer Pearson enter Ms. Mason's apartment and remain inside for fifteen minutes (ECF No. 1 at 9–11).  Petitioner alleges his mother shared this information with Petitioner's wife, Linda Barkley; that Mrs. Barkley verified this information with Ms. Hopkins; and that Mrs. Barkley then filed a complaint with the Quincy Police Department regarding Officer Pearson's involvement with Ms. Mason.  Petitioner states,

> . . . there is no way that [Petitioner], counsel or the court could have known about Ms. Hopkins' observations because she never came forward before or during trial and her name was never brought up in any pretrial discovery material.  Nobody could have known what she saw until she approached Ms. Green [Petitioner's mother] at Wal-Mart.

(ECF No. 1 at 10).

Petitioner argues that Ms. Hopkins' testimony would have been extremely useful in impeaching Ms. Mason's trial testimony.  He argues that the testimony would have contradicted Ms. Mason's testimony that she was afraid and distrustful of law enforcement.  Petitioner additionally argues that the testimony would have supported the defense's theory that Ms. Mason was "just trying to make some easy money by filing a civil lawsuit," by showing that Officer Pearson was coaching her as to what she needed to do and say in order to secure a favorable civil judgment. Petitioner contends that Ms. Hopkins' testimony would have raised a question as to Ms. Mason's credibility, and "may have been enough to create reasonable doubt" as to his guilt.  Therefore, he is entitled to a new trial.

Respondent contends that Ground Four does not present a federal claim, nor did Petitioner present a federal claim to the state courts regarding this "newly discovered evidence" (ECF No. 13 at 7–8).  Respondent argues that in Petitioner's Rule 3.850 motion, he argued that he was entitled to a new trial based upon the post-trial discovery of Ms. Hopkins' observations on the night of the offense; however, Petitioner argued the issue, and the state court resolved it, on purely state law grounds. Respondent contends that any attempt to return to state court to present a federal claim would be procedurally bared; therefore, Petitioner is not entitled to a merits review of

the claim in federal court. Respondent alternatively argues that the claim is without

merit, because Ms. Hopkins' testimony had no probative value and no reasonable

likelihood of affecting the outcome of trial (*id.* at 8–9).

In Petitioner's reply, he contends Ms. Hopkins' testimony "would have

possibly" led to evidence that Ms. Mason initially met Officer Pearson during a

routine traffic stop and started a sexual relationship with him in exchange for leniency

(ECF No. 15 at 3). He alleges this would have been admissible under Florida's rape

shield law, because it was evidence of a pattern of conduct that was so similar to Ms.

Mason's conduct in his case that it was relevant to his consent defense.

"Claims . . . based on newly discovered evidence have never been held to state

a ground for federal habeas relief absent an independent constitutional violation

occurring in the underlying state criminal proceeding." Herrera v. Collins, 506 U.S.

390, 400, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993). As the Eleventh Circuit opined,

"It is not our role to make an independent determination of a petitioner's guilt or

innocence based on evidence that has emerged since the trial." Brownlee v. Haley,

306 F.3d 1043, 1065 (11th Cir. 2002). This rule is grounded in the principle that

"federal habeas courts sit to ensure that individuals are not imprisoned in violation of

the Constitution—not to correct errors of fact." Herrera, 506 U.S. at 400; *see also*

Mize v. Hall, 532 F.3d 1184, 1195 (11th Cir. 2008); Jordan v. Sec'y Dep't of Corr.,
485 F.3d 1351, 1356 (11th Cir. 2007).

Here, Petitioner does not allege that an independent constitutional violation
occurred in the underlying state criminal proceeding with regard to Ms. Hopkins'
information.  For example, Petitioner does not allege that the State knew about Ms.
Hopkins' observations and withheld the information from the defense.  Nor does
Petitioner allege that defense counsel was ineffective for failing to discover it; indeed,
Petitioner admits that there was "no way" counsel could have known about Ms.
Hopkins' observations.  Therefore, Petitioner's claim of newly discovered evidence
is not cognizable on federal habeas.

Moreover, to the extent Petitioner attempts to recharacterize his claim as a claim
of ineffective assistance of counsel (*see* ECF No. 15 at 4), his claim is defeated by his
admission that Ms. Hopkins' information was not reasonably discoverable prior to
trial.  Additionally, Petitioner has not proffered any reliable evidence as to the
substance of Ms. Hopkins' testimony if she had testified at trial; instead, he offers
only his version of what Ms. Hopkins' allegedly told Petitioner's mother and his wife.
Moreover, for the reasons discussed *supra* in Ground Two, Ms. Hopkins' testimony
would not have been admissible at trial, either as substantive evidence to support his

defense, or as impeachment evidence.[9]  Therefore, Petitioner is not entitled to federal

habeas relief on Ground Four.

      E.    <u>Ground Six[10]</u>:  "<u>Trial counsel rendered ineffective assistance by failing</u>
<u>to argue in his judgment of acquittal that there was no evidence presented by</u>
<u>the prosecution to prove that the alleged victim continuously remained in</u>
<u>custody to be considered led to reasonably believe that she was under the</u>
<u>control or authority of a law enforcement officer.</u>"

Petitioner claims that Attorney Nesbeth was ineffective for failing to argue, in

support of his motion for judgment of acquittal ("JOA"), that the evidence was

insufficient to show that Ms. Mason was in custody or under Petitioner's control or

authority at the time of their sexual contact (ECF No. 1 at 12–13).  Petitioner argues

that once Ms. Mason was allowed to drive away from the scene of the traffic stop, she

was no longer considered to be in custody or under his control or authority.  He argues

that the evidence showed that at the time the victim left the scene of the traffic stop,

Petitioner had possession of only Ms. Mason's "work badge," not her driver's license,

and he had not issued any tickets for traffic infractions.  Additionally, Ms. Mason

testified that while she was driving to the Gretna Police Department, Petitioner never

---

[9] The state post-conviction court denied Petitioner's claim of newly discovered evidence, asserted as Ground Four of his Rule 3.850 motion (*see* Ex. K at 9–11), on the ground that Petitioner "failed to demonstrate that any such evidence is 'newly discovered' in any meaningful sense or that such evidence would have been admissible or probative . . . ." (Ex. K at 20).

[10] The court re-ordered Petitioner's claims for organizational purposes.

followed her, and in fact he turned off the road and arrived at the Police Department before she did.  Petitioner admits he did not exhaust this claim in the state courts, but contends he is entitled to federal review of the claim pursuant to Martinez v. Ryan, — U.S. —, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012) (ECF No. 1 at 14; ECF No. 15 at 4–6).

Respondent contends the docket of the state trial court includes no entry showing that Petitioner moved for appointment of counsel during the Rule 3.850 proceeding; therefore, he cannot invoke the equitable-based Martinez decision to excuse his lack of exhaustion of Ground Six (ECF No. 13 at 12–13).  Respondent argues that by not seeking appointment of counsel, Petitioner did not alert the state court to any need for representation, and now he would be given a "blank check" to avoid lack of exhaustion for any imaginable ineffectiveness claim (id.).  Respondent alternatively argues that Petitioner's claim is without merit, because the argument he contends defense counsel should have made is frivolous (id. at 14–15).

As previously discussed, a federal court may consider the merits of a procedurally defaulted claim if the petitioner can show both "cause" for the default and "prejudice" from a violation of his constitutional right.  Wainwright v. Sykes, 433 U.S. 72, 84–85, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977).  To establish cause, a

petitioner must ordinarily "demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court." Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting Murray, 477 U.S. at 488) (quoting Strickland, 466 U.S. at 688).

In Martinez v. Ryan, the Supreme Court held that if "a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim . . ." when (1) "the state courts did not appoint counsel in the initial-review collateral proceeding" or (2) "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective" pursuant to Strickland." Martinez, — U.S.—, 132 S. Ct. 1309, 1318, 182 L. Ed. 2d 272 (2012).  In such instances, the habeas petitioner "must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." Id.

In Hittson v. GDCP Warden, 759 F.3d 1210, 1262 (11th Cir. 2014), the Eleventh Circuit explained Martinez's "substantial claim" requirement:

> Martinez articulated the "substantial claim" requirement as follows:

> To overcome the default, a prisoner must . . . demonstrate
> that the underlying ineffective-assistance-of-trial-counsel
> claim is a substantial one, which is to say that the prisoner
> must demonstrate that the claim has some merit. *Cf.*
> Miller–El v. Cockrell, 537 U.S. 322, 123 S. Ct. 1029, 154
> L. Ed. 2d 931 (2003) (describing standards for certificates
> of appealability to issue).

Martinez, — U.S. at —, 132 S. Ct. at 1318–19.  Neither Martinez nor
Trevino [v. Thaler, — U.S. —, 133 S. Ct. 1911, 185 L. Ed. 2d 1044
(2013)] elaborated on or applied this standard, but we take the Court's
reference to Miller–El to mean that it intended that lower courts apply
the already-developed standard for issuing a COA, which requires "a
substantial showing of the denial of a constitutional right."  28 U.S.C. §
2253(c)(2).

As the Court explained in Miller–El, "[a] petitioner satisfies this
standard by demonstrating . . . that jurists could conclude the issues
presented are adequate to deserve encouragement to proceed further."
537 U.S. at 327, 123 S. Ct. at 1034. Where a petitioner must make a
"substantial showing" without the benefit of a merits determination by
an earlier court, he must demonstrate that "jurists of reason would find
it debatable whether the petition states a valid claim of the denial of a
constitutional right."  Slack v. McDaniel, 529 U.S. 473, 484, 120 S. Ct.
1595, 1604, 146 L. Ed. 2d 542 (2000).  That does not mean that a
petitioner must show "that some jurists would grant the petition."
Miller–El, 537 U.S. at 338, 123 S. Ct. at 1040.   "[A] claim can be
debatable even though every jurist of reason might agree, after the . . .
case has received full consideration, that petitioner will not prevail." *Id.*

We observe that this standard is similar to the preliminary review
conducted by district judges in § 2254 proceedings. Rule 4 of the § 2254
Rules allows the district judge to summarily dismiss a petition "[i]f it
plainly appears from the petition and any attached exhibits that the
petitioner is not entitled to relief."  The Advisory Committee Notes
further instruct that, in keeping with the heightened, fact-pleading

requirement in habeas cases, "the petition is expected to state facts that point to a real possibility of constitutional error."  Advisory Committee Note to Rule 4 of the Rules Governing Section 2254 Cases (quotation marks omitted).

Thus, we examine the allegations in . . . the § 2254 petition to see whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right."  In making this determination, we consider the fact-pleading requirement for § 2254 petitions, and the standard from Strickland.

Hittson, 759 F.3d at 1269–70 (footnotes omitted).

Here, Petitioner has failed to demonstrate that his underlying IATC claim has "some merit."  Petitioner contends Attorney Nesbeth was ineffective for failing to include, in his argument in support of a motion for a JOA, that there was insufficient evidence to satisfy the third element of the offense, specifically, that Petitioner was acting in such a manner as to lead Ms. Mason to reasonably believe that he was in a position of control or authority as an agent or employee of the government (*see* Ex. D at 450).

Under Florida law, "[a] trial court should not grant a motion for judgment of acquittal 'unless there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law.'"  Jackson v. State, 25 So. 3d 518, 531 (Fla. 2009) (quoting Coday v. State, 946 So. 2d 988, 996 (Fla. 2006)). "In reviewing the denial of a motion for judgment of acquittal, appellate courts apply

a de novo standard of review and do not reverse a conviction where the conviction is

supported by competent, substantial evidence." *Id.* "In determining the sufficiency

of the evidence, the question is whether, after viewing the evidence in the light most

favorable to the State, a rational trier of fact could have found the existence of the

elements of the crime beyond a reasonable doubt." <u>Simmons v. State</u>, 934 So. 2d

1100, 1111 (Fla. 2006) (quoting <u>Bradley v. State</u>, 787 So. 2d 732, 738 (Fla. 2001)).

At Petitioner's trial, Ms. Mason testified that she stopped her car because

Petitioner was behind her in a marked police car with his lights activated (Ex. B at

49–50).  She testified that Petitioner took her work badge and returned to his vehicle

(*id.* at 51).  Ms. Mason testified that Petitioner then returned to her car and informed

her that her license had been suspended and that she was going to jail (*id.* at 52).  Ms.

Mason testified that she asked Petitioner if she was going to have to leave her car

there, and would it be towed (*id.* at 54).  She testified that Petitioner responded that

her mother could pick up the car from the police department, and he instructed her to

drive there (*id.* at 55–56).  Ms. Mason testified that upon her arrival at the police

department, Petitioner was standing outside his vehicle, and verbally and physically

instructed her where to park her car (*id.* at 57–58).  She testified that Petitioner

returned her work badge to her, and then told her she was going to jail (*id.* at 59).  Ms.

Mason testified that Petitioner placed one of his hands around both of her hands and led her to the door of the police station (*id.* at 59–60). Ms. Mason testified that Petitioner unlocked the door, led her to a back room, and turned off all of the lights (*id.* at 60–61). She testified that Petitioner told her she had to do something for him or she was going to jail (*id.* at 63). Ms. Mason testified that Petitioner led her by the hand to a bench (*id.* at 65–66). She testified that she heard him start to unbuckle his pants, so she pulled down her pants (*id.* at 66). She testified that Petitioner then penetrated her vagina with his penis (*id.* at 66–67).

Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that at the time Ms. Mason and Petitioner had sex, Petitioner was acting in such a manner as to lead Ms. Mason to reasonably believe that he was in a position of control or authority as an agent or employee of the government. Therefore, it was proper to submit the issue to the jury, and defense counsel had no meritorious basis to argue for a JOA on the ground that there was no legally sufficient evidence that Petitioner was acting in such a manner as to lead Ms. Mason to reasonably believe that he was in a position of control or authority at the time they had sex. Further, there was no reasonable probability that

the trial court would have properly granted the motion for a JOA if counsel had made

that argument.

Petitioner failed to show "cause" for his procedural default of Ground Six and

"prejudice" from the alleged violation of his right to effective assistance of counsel.

Therefore, he is not entitled to a federal merits review of his unexhausted and

procedurally defaulted IATC claim.

F.    <u>Ground Seven:  "Trial counsel rendered ineffective assistance by failing
to file a motion to dismiss or suppress evidence on the ground that the alleged
victim had prior knowledge that her driver's license was suspended and her
encounter with the Petitioner would not have occurred had she not been
illegally driving or operating a motor vehicle."</u>

Petitioner claims that Attorney Nesbeth was ineffective for failing to file a

motion to dismiss the charge, or a motion to suppress evidence against him, on the

ground that Ms. Mason deliberately operated her vehicle knowing that her driver's

license was suspended (ECF No. 1 at 15–16).  Petitioner argues that Ms. Mason's

conduct proves that she consented to sex, because it "proves that she intentionally

drives and once stopped by the police she proposition[s] all male officers with sex in

exchange for liency [sic]" (ECF No. 15 at 6).  Petitioner contends that if Ms. Mason

had not been knowingly driving with a suspended license, he "would not have been

placed [in] a criminal position" (ECF No. 1 at 15).  He argues that if Attorney Nesbeth

had made this argument, there is a reasonable probability that the trial court would have either dismissed the charge or suppressed the evidence against him.  Petitioner admits that he did not exhaust this claim in the state courts, but relies upon <u>Martinez</u> to obtain federal review of his claim.

Respondent contends that not only is this argument frivolous, it is repulsive (ECF No. 13 at 15).  Respondent argues that there is no law under which the victim's unrelated misconduct of driving with a suspended license excuses or justifies rape; therefore, defense counsel was not ineffective for failing to seek dismissal or suppression based upon such a theory.

Petitioner cites no legal authority and no factual support upon which Attorney Nesbeth could have relied in arguing a motion to dismiss or a motion to suppress based upon the theory that Ms. Mason engaged in a pattern of violating the law and then propositioning officers for sex in exchange for leniency after she was caught.  Further, to the extent that Petitioner propounds a "she asked for it" theory, the court agrees with Respondent that the theory is not only frivolous but also repulsive; it warrants no further discussion.  Therefore, Petitioner is not entitled to a federal merits review of his unexhausted and procedurally defaulted IATC claim based upon counsel's failure to file a motion to dismiss or motion to suppress.

G.    Ground Eight:  "Trial counsel rendered ineffective assistance by failing to request to have notes of investigator Ulysses Jenkins authenticated pursuant to 90.901, Florida Statutes."

Petitioner claims that Attorney Nesbeth was ineffective for failing to request that Investigator Jenkins' field notes from his interview with Ms. Mason be authenticated pursuant to Florida Statutes § 90.901 (ECF No. 1 at 16).  Petitioner alleges that after Investigator Jenkins initially testified, the prosecutor re-called him, and during this subsequent testimony, Jenkins "testified from a copy of his notes" to correct a misstatement he had made during his initial testimony (*see* ECF No. 1 at 16; ECF No. 15 at 7).  Petitioner alleges Investigator Jenkins admitted that he could not find the original version of his field notes (*id.*).  Petitioner alleges the prosecutor concealed the original field notes from Petitioner, defense counsel, and the trial court (*id.*).  Petitioner argues that if Attorney Nesbeth had "requested for the notes to be authenticated," under § 90.901, there is a possibility that the notes would have been determined to be a "sham" (ECF No. 1 at 16).  Petitioner admits he did not exhaust this claim in the state courts, but contends he is entitled to federal review of the claim pursuant to Martinez (*id.* at 17).

Respondent contends that there is no indication in the record that the copy of the notes used by Investigator Jenkins to refresh is recollection during his testimony

was not authentic; therefore, Petitioner cannot demonstrate that he was prejudiced by defense counsel's failure to challenge the authenticity of the notes (ECF No. 13 at 15–17).

The context of Ground Eight is the following.  During Attorney Nesbeth's initial cross-examination of Investigator Jenkins, counsel elicited the following testimony:

> Q.     You indicate, based on your investigation, you indicated that Ms. Mason stayed at the police station in Gretna for approximately ten minutes after being let out by Officer Barkley, is the [sic] right.
>
> A.     That is an estimation, yes, sir.
>
> Q.     Based on your investigation, let me be clear, after being let out of the Gretna Police Department, Ms. Mason stayed at the Gretna police station for approximately ten minutes, correct?
>
> A.     Say that again?  I didn't follow you.
>
> Q.     Based on your investigation, after being let out of the Gretna Police Department by Mr. Barkley, Ms. Mason stayed at the police department for approximately ten minutes?
>
> A.     No.
>
> Q.     That's not what you said?
>
> A.     No.
>
> Q.     You wrote a report, a complete, detailed and accurate report?

A.      Yes, sir.

Q.      And that's not in your report?

A.      No.

Q.      Would looking at your report refresh your recollection?
. . . .
A.      I did put that in there.  I apologize.

Q.      All right.  So based on your investigation, Ms. Mason, after being let out of the Gretna Police Department stayed there for ten minutes?

A.      According to my report, it says she did state that, yes, sir.

(Ex. C at 279–81).  On re-direct, Investigator Jenkins testified that his report was not a verbatim transcript of his interview with Ms. Mason; rather, it was just a summary of the interview (*id.* at 286).

After the prosecutor presented testimony from additional witnesses, but before the State rested its case, the prosecutor announced (outside the presence of the jury) that he intended to recall Investigator Jenkins (Ex. D at 338).  Attorney Nesbeth conferred with Investigator Jenkins off the record (*see id.* at 338), and then objected to the State's recalling him as a witness:

MR. NESBETH:  Judge, I'm going to have some concerns with the recalling of this witness, particularly with what he's going to testify to.

> I believe he is going to testify to there was some testimony about her waiting at the station for ten minutes. The investigator indicates that he went back and looked at his notes, that that was a mistake when he testified that way.
>
> I'm going to have two problems with that: one, that's something that should have been handled yesterday. Anything having to deal with that testimony has already been—that field has been plowed.
>
> Number two, I asked the investigator about those the [sic] notes that he went back and looked at. He doesn't have the original notes. He has copies. He indicates that he submitted the originals to Mr. Combs [the prosecutor]. Mr. Combs indicated he doesn't have the originals, and they were never submitted to him.
>
> I have never seen them, these supposed notes. It's a discovery violation. I object to him being recalled. I object specifically to that testimony for the grounds that I have laid out.

(Ex. D at 339). After hearing argument from the prosecutor and additional argument from Attorney Nesbeth (including argument that the court's permitting Jenkins' additional testimony violated Petitioner's due process rights), the trial court ruled that there was no violation of Florida's discovery rules, because Rule 3.220(b)(1)(b) of the Florida Rules of Criminal Procedure expressly excluded from discovery/disclosure notes from which police investigative reports are prepared (*id.* at 340–53).

The prosecutor then re-called Investigator Jenkins, and he testified that his previous testimony, that Ms. Mason told him she stayed at the police station for ten minutes "after being let out," was erroneous (Ex. D at 369–72, 384–85). Jenkins

testified that his report was also erroneous in this respect (*id.*).  He testified that what

Ms. Mason told him was that she was in the police station for ten minutes "before

being let out" (*id.*).  Attorney Nesbeth rigorously and vigorously cross-examined

Investigator Jenkins about the change in his testimony and the error in his report (*id.*

at 372–84, 386–88).

Petitioner contends Attorney Nesbeth should have requested authentication of

Investigator Jenkins' notes under Florida Statutes § 90.901.  That statute provides, in

relevant part:  "Authentication or identification of evidence is required as a condition

precedent to its admissibility."  Fla. Stat. § 90.901 (emphasis added).

The Florida statute applicable to refreshing the memory of a witness provides,

in relevant part:

> When a witness uses a writing or other item to refresh memory while
> testifying, an adverse party is entitled to have such writing or other item
> produced at the hearing, to inspect it, to cross-examine the witness
> thereon, and to introduce it, or, in the case of a writing, to introduce
> those portions which relate to the testimony of the witness, in evidence.

Fla. Stat. § 90.613.  Under Florida law, a writing used to refresh recollection does not

have to be an original.  *See* Garrett v. Morris Kirschman & Co., Inc., 336 So. 2d 566,

569 (Fla. 1976) (citations omitted).  Indeed, the writing need not be one which was

even made by, or previously seen by, the testifying witness.  *See* <u>R.A.B. v. State</u>, 399

So. 2d 16, 17, n.4 (Fla. 3d DCA 1981) (citations omitted).

The trial transcript demonstrates that Investigator Jenkins used a copy of his

field notes, as well as a copy of a report he authored, only to refresh his recollection

during his trial testimony (*see* Ex. C at 261–92; Ex. D at 370–89).  Neither Jenkins'

notes nor his report were admitted into evidence (*see* Ex. B at 2; Ex. C at 168–71; Ex.

D at 336–37).[11]  Therefore, Attorney Nesbeth had no meritorious basis to request that

the notes be authenticated in order for Investigator Jenkins to use them to refresh his

recollection.

---

[11] The record demonstrates that thirteen (13) exhibits, all of which were the State's, were admitted into evidence at Petitioner's trial.  State's Exhibits 1, 2, and 3 were photographs of Petitioner's patrol car, Petitioner, and a condom, respectively (*see* Ex. C at 184–86).  State's Exhibit 4 was a condom in a foil wrapper (*id.* at 297, 310–15).  State's Exhibit 5 was a paper towel collected from the floor of the room where the sexual battery occurred (*id.* at 305–07).  State's Exhibit 6 was a buccal swab collected from Petitioner (*id.* at 318).  State's Exhibit 7 was the sexual assault kit collected from Ms. Mason by medical staff at the hospital where she was examined after the sexual battery occurred (*id.* at 318–20).  State's Exhibit 8 was a record from the Internet Records Information System ("IRIS") showing that a search or inquiry into Ms. Mason's driving record was made by the Gretna Police Department on September 4, 2010 (*id.* at 237–41).  State's Exhibit 9 was a record of the "DAVID" system, a system that provides "real time access for law enforcement to driver's motor vehicle records," showing that an inquiry into the records of the motor vehicle that Ms. Mason was driving was made by the Gretna Police Department on September 4, 2010 (*id.*).  State's Exhibits 10 and 11 were photographs of the paper towel found on the floor in the room where the sexual battery occurred (*id.* at 203–04).  State's Exhibit 12 was a report prepared by Traci Love, a crime laboratory analyst with the Florida Department of Law Enforcement ("FDLE"), of the fingerprint analysis she performed on the condom wrapper  (*id.* at 297–99).  State's Exhibit 13 was a report prepared by Claudette Cleary, a crime lab analyst in the biology section of the FDLE, of the biological testing, if any, she performed on the condom, paper towel, and items in the sexual assault kit (*id.* at 302–20).

Petitioner failed to demonstrate that his IATC claim is a "substantial one," for purposes of showing cause, pursuant to <u>Martinez</u>, for his failure to exhaust Ground Eight.  Therefore, he is not entitled to a federal merits review of this IATC claim.

    H.    <u>Ground Five: "Whether Petitioner was denied effective assistance of counsel based upon counsel's cumulative errors."</u>

Petitioner argues that the cumulative effect of Attorney Nesbeth's errors deprived him of constitutionally effective assistance of counsel (ECF No. 1 at 12; ECF No. 15 at 4).

Respondent contends that because Petitioner failed to demonstrate ineffective assistance of counsel with respect to any individual claim of error, therefore, there is nothing to accumulate into a separate claim of ineffectiveness (ECF No. 13 at 10–12).

Petitioner's "cumulative effect" claim is without merit.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Although the Eleventh Circuit has noted, on direct appeal of a federal conviction, that the cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial

may be necessary,[12] the Eleventh Circuit has never expressly recognized a freestanding "cumulative effect" claim, based upon the assertion that alleged errors of the trial court, defense counsel, or the State, or a combination thereof, rendered the trial fundamentally unfair even though such errors were individually harmless or non-prejudicial, as cognizable under § 2254. *See, e.g.,* Conklin v. Schofield, 366 F.3d 1191, 1210 (11th Cir. 2004) (applying pre-AEDPA standard of review and denying claim that trial court errors and conduct of trial counsel combined to rob petitioner of fair trial and sentencing, but not relying upon Supreme Court precedent for its decision); Sims v. Singletary, 155 F.3d 1297 (11th Cir. 1998) (applying pre-AEDPA standard of review and holding that district court erred in finding that cumulative guilt stage errors prejudiced petitioner during penalty phase); Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997) (applying pre-AEDPA standard of review and declining petitioner's invitation to entertain "cumulative error" claim because petitioner's trial was not fundamentally unfair); Dobbs v. Kemp, 790 F.2d 1400, 1505 (11th Cir. 1986)

---

[12] *See* United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) ("The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal.") (internal quotations and citations omitted); United States v. Ramirez, 426 F.3d 1344, 1353 (11th Cir. 2005) ("[T]he 'cumulative effect' of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible.") (quoting United States v. Thomas, 62 F.3d 1332, 1343 (11th Cir. 1995) and citing United States v. Adams, 74 F.3d 1093, 1099–1100 (11th Cir. 1996)).

(applying pre-AEDPA standard of review and denying petitioner's claim that improper prosecutorial argument and evidentiary errors rendered trial fundamentally unfair and citing Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1973)); Bronstein v. Wainwright, 646 F.2d 1048, 1056 (5th Cir. 1981) (same).[13]

In any event, cumulative effect analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors. See United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004) (where no individual errors have been demonstrated, no cumulative errors can exist); Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Mullen cites no authority in support of his assertion,

---

[13] The law of the other circuit courts of appeals is mixed on the issue of whether a claim of "cumulative effect" or "cumulative error" is cognizable on federal habeas. The Fourth, Sixth and Eighth Circuits do not recognize cumulative error claims on federal habeas. See Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006) (claims of cumulative error are not cognizable on federal habeas because the Supreme Court has not spoken on this issue); Fisher v. Angelone, 163 F.3d 835, 852–53 (4th Cir. 1998) (ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively); Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief."). The Ninth Circuit recognizes cumulative error claims and expressly recognized Chambers v. Mississippi, 410 U.S. 284 (1973) as the clearly established federal law governing such claims. See Parle v. Runnels, 505 F.3d 922, 928–29 (9th Cir. 2007). The Tenth Circuit recognizes cumulative error claims and recognized Brecht v. Abrahamson, 507 U.S. 619 (1993) as the clearly established federal law on this issue. See Darks v. Mullin, 327 F.3d 1001, 1018 (10th Cir. 2003). The Second and Seventh Circuits recognize cumulative effect analysis of individual claims of ineffective assistance of counsel in applying the prejudice prong of Strickland. See Williams v. Washington, 59 F.3d 673, 682–84 (7th Cir. 1995); Rodriguez v. Hoke, 928 F.2d 534 (2d Cir. 1991).

Case 4:15-cv-00296-WS-EMT   Document 16   Filed 06/22/16   Page 59 of 61

Page 59 of 61

which, if adopted, would encourage habeas petitioners to multiply claims endlessly in the hope that, by advancing a sufficient number of claims, they could obtain relief even if none of these had any merit. We receive enough meritless habeas claims as it is; we decline to adopt a rule that would have the effect of soliciting more and has nothing else to recommend it. Twenty times zero equals zero."); *see also* <u>United States v. Hall</u>, 455 F.3d 508, 520 (5th Cir. 2006); <u>Mancuso v. Olivarez</u>, 292 F.3d 939, 957 (9th Cir. 2002) (where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation); <u>United States v. Hardy</u>, 224 F.3d 752, 757 (8th Cir. 2000); <u>Angelone</u>, *supra*; <u>Moore v. Reynolds</u>, 153 F.3d 1086, 1113 (10th Cir. 1998); <u>United States v. Rivera</u>, 900 F.2d 1462, 1471 (10th Cir. 1990) ("[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.").

As previously discussed, Petitioner has not shown error of a constitutional dimension with respect to any of the alleged errors of trial counsel. Therefore, he is not entitled to federal habeas relief on this "cumulative effect" claim.

## V.    CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final

Case No.: 4:15cv296/WS/EMT

order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 22nd day of June 2016.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**